# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2015

## STATE OF TENNESSEE v. DEANGELO JACKSON aka DEANGELO WEBB

### Appeal from the Criminal Court for Shelby County
### No. 13-01259     James M. Lammey, Judge

_____

### No. W2014-01981-CCA-R3-CD  -  Filed November 24, 2015

_____

Deangelo Jackson ("the Defendant") was indicted with one count each of especially aggravated robbery, attempted second-degree murder, and employing a firearm during the commission of a dangerous felony. After a jury trial, the trial court entered judgments of conviction for especially aggravated robbery and facilitation of attempted second-degree murder and imposed an effective thirty-two-year sentence.[1] On appeal, the Defendant raises two issues: (1) whether the evidence was sufficient to support his convictions and (2) whether the trial court erred when it held that the State would be allowed to impeach the Defendant's testimony with evidence of his prior convictions for theft and felon in possession of a handgun. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Stephen Bush, District Public Defender; Harry E. Sayle III (on appeal), Assistant District Public Defender; and Michele Lynn and John Zastrow (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Deangelo Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Johnathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jessica Banti, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The charge of employing a firearm during the commission of a dangerous felony was dismissed by operation of law.

# OPINION

## Factual and Procedural Background

The Defendant was indicted with especially aggravated robbery in Count 1, attempted second-degree murder in Count 2, and employing a firearm during the commission of a dangerous felony in Count 3 in connection with the robbery and shooting of Rodrigo Rivas. Prior to trial, the State noted that attempted second-degree murder was the applicable accompanying dangerous felony in Count 3.

At trial, Mr. Rivas testified that, around 11:00 p.m. on the night of the offense, he and two friends were pushing a car into a carwash parking lot. Mr. Rivas recalled that the area was dark but there were some street lamps. While they were pushing the car, two people approached them from behind, one of whom had a gun. The gunman fired a shot into the air, and Mr. Rivas' companions ran. The gunman placed the gun against Mr. Rivas' head and ordered him "to get down on the floor, right next to the car." Mr. Rivas complied to avoid being shot. The gunman then demanded Mr. Rivas' wallet. As Mr. Rivas was handing the gunman his wallet, he turned to see the gunman. The gunman said, "Don't look at me" and shot Mr. Rivas in the back. The gunman then demanded Mr. Rivas' phone. Again, Mr. Rivas handed the gunman his phone and turned to look at the gunman. The gunman said, "I told you, I'm going to kill you. Don't look at me." He then shot Mr. Rivas in the back a second time. The entire episode lasted "three to five minutes," and the two robbers ran after they shot Mr. Rivas the second time. Mr. Rivas explained that he did not see the gun, but he saw the gunman "twice quickly." Mr. Rivas recalled that the gunman was wearing a hoodie that covered more of his hair and face, but Mr. Rivas saw the gunman's face. Mr. Rivas identified that Defendant as the gunman.

After the Defendant and his companion had left the scene, Mr. Rivas looked around and saw that his friends were gone. Mr. Rivas managed to get up and walk to a convenience store to find a phone. People in the store called the police and an ambulance for him. The gunshots went through Mr. Rivas's large intestine, coccyx (tailbone), and one of his testicles. Mr. Rivas underwent multiple surgeries and wore a colostomy bag for a year. At the time of trial, he still experienced pain from the injuries and could not sit for more than forty-five minutes to an hour.

About two weeks after the date of the offense, officers from the Memphis Police Department ("MPD") asked Mr. Rivas to view several photo lineups. Mr. Rivas viewed the lineups, circled the Defendant's photo, and wrote, "This is the one who robbed me and shot me." Mr. Rivas explained that he circled the Defendant's photo "right away" when he saw it. Mr. Rivas also stated that, although the street lights in the area were not consistently illuminated, there was a street lamp directly above his car, and he was able to

get a clear look at the Defendant's face. Mr. Rivas said he was "a hundred percent" sure that the Defendant was the person who shot him.

Mr. Rivas also confirmed that he testified at a preliminary hearing in 2012. Mr. Rivas admitted that he had "a little bit of confusion that day" and had trouble identifying the Defendant because the Defendant was not wearing a hoodie and was wearing glasses at the time. As a result of his confusion, Mr. Rivas initially identified the Defendant as the person who shot him but then identified someone else who looked similar to the Defendant who was not wearing glasses. Mr. Rivas explained that the Defendant was not wearing glasses at the time of the offense and that, on the day of the preliminary hearing, Mr. Rivas was under the influence of pain medication.

On cross-examination, Mr. Rivas denied telling a police detective on the day after the offense that he did not see the robber's face. Mr. Rivas also recalled that, at the preliminary hearing, "they did make everyone take off their glasses." Mr. Rivas noted that he identified someone else at the preliminary hearing, but he stated that he switched his identification back to the Defendant. Mr. Rivas was permitted to listen to a recording of the preliminary hearing outside of the jury's presence in order to refresh his memory. After listening to the recording, Mr. Rivas admitted that he identified a person named Kendrick Brown as the robber at the preliminary hearing. However, Mr. Rivas insisted that he "came back to the defendant."[2] On redirect examination, Mr. Rivas said he was "very positive" that the Defendant was the person who robbed and shot him.

Marion Hardy testified that, on the night of the offense, he was helping Mr. Rivas and Jeremy Holmes push Mr. Rivas' car out of a carwash parking lot.[3] As the three men were moving the car, two other men, one of which Mr. Hardy knew, were standing on the sidewalk. Mr. Hardy thought that both men were carrying guns. Mr. Hardy stated that he recognized one of the men as a person he knew as "Mulah." Mr. Hardy identified the Defendant as "Mulah."

After Mr. Hardy had seen the two men, "all of a sudden" someone shot over Mr. Hardy's, Mr. Rivas', and Mr. Holmes's heads. Mr. Hardy and Mr. Holmes "stood back," and Mr. Hardy saw someone "put [Mr. Rivas] in the car." Then he heard one gunshot and assumed someone had shot Mr. Rivas. After that, "two [additional] guys came from behind the building" and shot over Mr. Hardy and Mr. Holmes's heads. Mr. Holmes

_____

[2] In a bench conference, the prosecutor indicated that Mr. Rivas did not ultimately change his identification back to the Defendant at the preliminary hearing. However, a copy of the preliminary hearing is not included in the record on appeal.

[3] According to Mr. Hardy, he was helping Mr. Rivas move the car out of the carwash parking lot because the owner of the carwash did not want the car on his property. We note that Mr. Hardy's testimony contradicts that of the other witnesses in this detail. However, neither party addressed the contradiction.

- 3 -

"took off running," but Mr. Hardy lay down on the ground and gave the two other robbers his wallet. After surrendering his wallet, Mr. Hardy ran away. He did not see what happened with the Defendant and the man who was with him. After the robbers left, Mr. Hardy saw Mr. Rivas stagger from his car and collapse in front of a barber shop.

Later, Mr. Hardy gave a statement to police and viewed a photo lineup. Mr. Hardy identified a photo of the Defendant and wrote, "robbery, the mean friend" under his picture. Mr. Hardy explained his notation, stating, "I never did think Mulah was that kind of person. He didn't seem like he was that kind of person when I first met him." However, Mr. Hardy's opinion of the Defendant changed when he saw him participate in the robbery. Mr. Hardy stated that he was "ninety-nine percent" sure that the Defendant was one of the two men that robbed and shot Mr. Rivas. Mr. Hardy agreed that ninety-nine percent was "about as certain as it gets."

On cross-examination, Mr. Hardy confirmed that he gave a statement to police the day after the offense but he did not identify the Defendant as one of the robbers at that time because "[t]hey didn't ask [him]." Defense counsel then read a portion of Mr. Hardy's statement in which the police asked, "Can you identify the suspects that you saw [if you saw] them again?" and Mr. Hardy responded, "I think so." Mr. Hardy admitted that he made that statement but maintained that he did not identify the Defendant because he did not know the Defendant's real name and because the police had not shown him a photo of the Defendant. Mr. Hardy also admitted that, three days after the offense, he called police out to the carwash and told them that a man sitting on the newspaper stand, Travis Brown, was one of the people involved in the robbery, but he still did not identify the Defendant. Mr. Hardy explained that he first identified the Defendant to the police when the police showed him the photo lineup containing the Defendant's picture. When Mr. Hardy saw the Defendant's picture and said "Mulah," the police informed him of the Defendant's name. On redirect examination, Mr. Hardy stated that he alerted the police to Mr. Brown because he thought Mr. Brown was involved in setting up the robbery.

Jeremy Holmes testified that, on the night of the offense, he was helping Mr. Rivas and Mr. Hardy push a car into a parking spot in a carwash parking lot so that Mr. Rivas could advertise the car as being for sale. Mr. Holmes asked two people who were walking down the sidewalk to help them push the car. However, before Mr. Holmes finished his sentence, one of the individuals pulled out a pistol and fired a shot into the air. Mr. Holmes "saw fire shoot out of the barrel" and ran. Mr. Holmes heard "like another three shots" as he was running. After the incident, Mr. Holmes saw Mr. Rivas walking down the sidewalk. Mr. Holmes told him to sit down because he could see blood dripping from Mr. Rivas' body, but Mr. Rivas acted as if he did not want to sit down. Mr. Holmes gave a statement to police and said he did not know the people who had committed the robbery. However, he later viewed a photo lineup, picked out a photo, and

wrote, "I think this is the guy that shot in the air when [Mr. Rivas] was robbed, but I'm not one hundred percent sure." Mr. Holmes explained that the photo looked familiar but he was not sure of his identification because the robber had a hood on and he did not "want to falsely say, you know, what [he] didn't really see." On cross-examination, Mr. Holmes acknowledged that he did not see Mr. Rivas being robbed because he was running from the scene.

MPD Officer Eric Hutchinson testified that he responded to the scene of the robbery and shooting. There, he took photos and collected evidence. Officer Hutchinson found a nine-millimeter bullet casing near the sidewalk and what appeared to be blood on the ground. Officer Hutchinson agreed that the blood evidence appeared to move away from the car toward the shopping center on the other side of the parking lot. On cross-examination, Officer Hutchinson stated that he found a bullet casing but he did not find a bullet on the scene. He did not recover a gun, wallet, or phone from the scene. Officer Hutchinson did not know if anyone collected surveillance video from any of the businesses near the scene of the robbery.

MPD Detective Fausto Frias testified that he was assigned to investigate the robbery and shooting in this case. Detective Frias went to the hospital where Mr. Rivas was being treated and spoke with Mr. Rivas. At that time, Mr. Rivas told him, "I saw who shot me, and I can identify him at a later date." While waiting for Mr. Rivas to be released from the hospital, Detective Frias spoke with some people who lived in the neighborhood where the robbery and shooting took place. Eventually, Detective Frias developed multiple suspects in the case and created several photo lineups to show the victims and other witnesses. Mr. Rivas identified the Defendant's photo in the fourth photo lineup. Based on that identification, Detective Frias obtained an arrest warrant for the Defendant, but he was unable to locate the Defendant. After several attempts to find the Defendant, Detective Frias called the Defendant's mother and told her that the police needed to talk to her son about the robbery. About an hour and a half after that call, the Defendant called Detective Frias and told the detective where he could be found. Detective Frias interviewed the Defendant, and the Defendant initially denied being present at the robbery or knowing anything about the robbery. After Detective Frias informed the Defendant that surveillance videos from the nearby businesses would show whether the Defendant was there, the Defendant admitted to being present at the robbery. However, the Defendant denied shooting anyone. He said that he heard shots and "took off running" to a friend's apartment. Detective Frias asked the Defendant for the friend's phone number and address, but the Defendant could not provide such information. The Defendant explained that he did not return to the scene to give a statement to police because he did not want to be involved. He also stated that he did not know who shot and robbed Mr. Rivas because he "just ran."

- 5 -

Detective Frias also showed the photo lineup to Mr. Holmes on the same day as the preliminary hearing. At that time, Mr. Holmes circled the Defendant's picture but said he was not one hundred percent sure about his identification.

On cross-examination, Detective Frias acknowledged that the Defendant had indicated on the Advice of Rights form that he could not read or write without the aid of eyeglasses. Detective Frias also admitted that he showed the photo lineups to the victims on different days. He explained that it was policy to show victims lineups when it was convenient for the victim.

After the State rested its case-in-chief, the trial court conducted a jury-out hearing to determine whether the Defendant's prior convictions could be used to impeach his testimony. The State noted that the Defendant had previous convictions of felon in possession of a handgun from 2011, theft of property over $1,000 from 2009, and theft of property under $500 from 2009. The Defendant argued that the crimes were substantially similar to the crimes for which he was being tried and that the convictions would be "substantially more prejudicial than probative." The State countered that none of the Defendant's prior convictions were for violent crimes. The trial court noted that "especially-aggravated robbery is a theft committed in a more egregious manner." However, the court found that the Defendant's prior conviction for felon in possession of a handgun was not substantially similar to any of the charges for which the Defendant was on trial and that his convictions for theft were probative of the Defendant's "dishonesty." The court allowed the State to use the convictions to impeach the Defendant if he chose to testify. The Defendant elected not to testify.

Dr. Jeffrey Neuschatz testified as an expert in eyewitness identification. Dr. Neuschatz explained that longer exposure time, or how long someone has to evaluate or study information, will result in a better memory of what was studied. Additionally, Dr. Neuschatz explained that memory is more susceptible to impairment the longer the amount of time between the time someone studied something and the time the person was tested on what they studied. In short, Dr. Neuschatz explained that it was "[m]uch more difficult to remember things accurately when you don't get to study them for a long time and then you're tested a long time afterwards[.]" Dr. Neuschatz stated that, based on his research, the thirteen-day gap between the robbery of Mr. Rivas and Mr. Rivas' identification of the Defendant constituted a long gap. Dr. Neuschatz also stated that high-stress situations, such as the robbery in this case, impaired the reliability of identifications. Additionally, Dr. Neuschatz explained that the accuracy of an identification was affected when a weapon was used because the weapon drew people's attention and made them less attentive to other aspects of the scene, such as the identity of the perpetrator. Further, studies showed that head coverings impaired eyewitness identification, and identification accuracy was much worse when people were asked to

identify someone who was wearing something that covered their hairline. In this case, Dr. Neuschatz noted that identification would be impaired if the suspect was wearing a hoodie. Dr. Neuschatz also explained that a witness's confidence in their identification did not mean that the identification was accurate. This is because the witness's confidence could be affected by outside influences, such as someone telling the witness they had chosen the right person. Moreover, Dr. Neuschatz noted that people have "a great deal of difficulty" identifying someone who is of a different race than themselves. In this case, Mr. Rivas and the Defendant were different races.

On cross-examination, Dr. Neuschatz confirmed that a witness's identification could be accurate even if it was made in a stressful situation. He also stated that an identification was more likely to be accurate if the witness was familiar with the identified person. He also admitted that it was possible for people to accurately identify someone who was of a different race than themselves.

After deliberations, the jury convicted the Defendant of especially aggravated robbery in Count 1, facilitation of attempted second-degree murder as a lesser-included offense in Count 2, and employing a firearm during the commission of a dangerous felony in Count 3. The trial court, acting as the thirteenth juror, approved the verdicts in Counts 1 and 2. The State dismissed Count 3 on the ground that employing a firearm during the commission of a dangerous felony did not apply to facilitation of attempted second-degree murder. The trial court ordered consecutive sentences of twenty-two years for especially aggravated robbery and ten years for facilitation of attempted second-degree murder for an effective sentence of thirty-two years. The trial court denied the Defendant's motion for new trial, and this timely appeal followed.

## Analysis

### *Sufficiency of the Evidence*

The Defendant argues that the evidence was insufficient to prove his identity as the person who committed the offenses. The Defendant contends that "the only evidence purporting to identify [the Defendant] as the robber is the testimony of Mr. Rivas" and notes that there was no forensic evidence linking him to the crime. The State argues that there was sufficient evidence to establish the Defendant's identity as one of the robbers.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978),

superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Especially aggravated robbery is defined as a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). The definition of "deadly weapon" includes a firearm. Tenn. Code Ann. § 39-11-106(a)(5) (Supp. 2011). "Serious bodily injury" is a bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone of a child who is eight years of age or under. Tenn. Code Ann. § 39-11-106(a)(34) (Supp. 2011).

As applicable to this case, second-degree murder is defined as "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2010). As charged in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of [second-degree murder], and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2) (2010). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal

responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2010).

In this case, the evidence is sufficient to prove the Defendant's identity for the purposes of his convictions. Mr. Rivas testified that he turned to see the robber's face two times during the robbery. Mr. Rivas also stated that he saw the robber's face but not the gun that shot him. While the lighting in the area was spotty, there was a street lamp directly above Mr. Rivas' car, and he was able to see the person's face. After he was released from the hospital, Mr. Rivas viewed several photo lineups and selected the Defendant's photo as the person who robbed him. Although Mr. Rivas questioned his identification at the preliminary hearing, he explained that he was confused by the Defendant's eyeglasses and that he was under the influence of pain medication at the time. Additionally, Mr. Hardy, who knew the Defendant by a nickname, identified the Defendant as one of the people who forced Mr. Rivas to the ground next to his car. The Defendant was able to challenge both of these identifications through cross-examination and through his own eyewitness identification expert. However, the jury made a factual finding that the Defendant was the person who committed the offenses. The evidence was sufficient to support their conclusion.

Further, when viewed in a light most favorable to the State, the evidence is sufficient to establish the other elements of each crime. Regarding the Defendant's conviction for especially aggravated robbery, the Defendant and his companion took property from Mr. Rivas through the use of violence or by putting Mr. Rivas in fear. Their demands for Mr. Rivas' property show that they acted intentionally and knowingly. During the course of the robbery, Mr. Rivas was shot with a gun, a deadly weapon, and sustained serious bodily injury to his large intestine, tail bone, and testicle, which required surgery. The evidence is sufficient to support the Defendant's conviction for especially aggravated robbery.

As to facilitation of attempted second-degree murder, the Defendant and his companion stood over Mr. Rivas with a gun, and at least one of them shot Mr. Rivas in the back. After each shot, Mr. Rivas heard someone say, "Don't look at me," and after the second shot, the gunman said, "I'm going to kill you." Mr. Rivas was shot twice in the back. A rational juror could conclude that the shooter acted with the intent to cause Mr. Rivas' death and believed that shooting Mr. Rivas in the back would cause his death without further action from the shooter. Further, the Defendant was standing next to his companion over Mr. Rivas as Mr. Rivas lay on the ground, so the jury could reasonably conclude that the Defendant knowingly furnished substantial assistance in the attempt to kill Mr. Rivas. The evidence was sufficient to support his conviction for facilitation of attempted second-degree murder. The Defendant is not entitled to relief on this issue.

*Impeachment by Prior Convictions*

The Defendant also argues that the trial court abused its discretion when it ruled that the Defendant's prior convictions could be used to impeach the Defendant's testimony. The Defendant contends that the trial court failed to weigh the prejudicial effect of admitting the prior convictions against the probative value they had on the issue of the Defendant's credibility. The Defendant claims that his prior convictions for theft were too similar to the instant charge of especially aggravated robbery and that his prior conviction for felon in possession of a handgun had little or no probative value as to his credibility. The State argues that the trial court did not err when it held that the Defendant's prior convictions would be admissible for impeachment. Alternatively, the State contends that any error was harmless.

We review a trial court's decision to admit evidence of prior convictions pursuant to Tennessee Rule of Evidence 609 under an abuse of discretion standard. State v. Russell, 382 S.W.3d 312, 317 (Tenn. 2012). "A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining." Id.

Tennessee Rule of Evidence 609 authorizes the use of certain prior convictions for the purpose of impeaching a witness's credibility. Tenn. R. Evid. 609(a). Evidence of prior convictions may be introduced to impeach a defendant's testimony under this rule when the following conditions are met: (1) the conviction was for a crime punishable by death or imprisonment in excess of one year or for a misdemeanor involving dishonesty or false statement; (2) less than ten years have elapsed between the date the accused was released from confinement and the commencement of prosecution; (3) the State gives reasonable written notice of the particular convictions it intends to use to impeach the defendant at trial; and (4) the trial court finds the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect. See Tenn. R. Evid. 609(a)-(b). When determining whether the probative value of a prior conviction outweighs its unfair prejudicial effect, the trial court should "(a) assess the similarity between the crime on trial and the crime underlying the impeaching conviction, and (b) analyze the relevance the impeaching conviction has to the issue of credibility." State v. Baker, 956 S.W.2d 8, 14 (Tenn. Crim. App. 1997) (quoting N. Cohen, D. Pain, and S. Sheppeard, Tennessee Law of Evidence § 609.9 at p. 376 (3d ed. 1995)) (internal quotation marks omitted); see also State v. Herron, 461 S.W.3d 890, 906 (Tenn. 2015).

"The mere fact that a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." Baker, 956 S.W.2d at 15. A prior conviction's relevance to the issue of credibility may outweigh the danger of prejudice created by its similarity to the charged offense. See id. at 14. Tennessee

- 10 -

appellate courts have held that prior theft and burglary convictions are "highly probative of credibility" because it involves a crime of dishonesty. Id. at 15. In other cases, appellate courts have held that convictions may be used to impeach a defendant even when the defendant is being tried for the same offense. See, e.g., State v. Mickey Edwards, No. W2014-00987-CCA-R3-CD, 2015 WL 5169110, at *16-*17 (Tenn. Crim. App. Aug. 27, 2015) (theft convictions admissible to impeach defendant in prosecution for theft); Baker, 956 S.W.2d at 15 (prior convictions for burglary admissible to impeach defendant in prosecution for aggravated burglary).

Even if admission of a defendant's prior convictions for the purposes of impeachment was error, the defendant is only entitled to relief if the error "more probably than not affected the judgment to the defendant's prejudice." State v. Taylor, 993 S.W.2d 33, 35 (Tenn. 1999). Such review requires this court to examine the theory of defense—gleaned from the arguments of counsel, presentation of evidence in the defendant's case-in-chief, and cross-examination of the State's witnesses—to determine "whether the erroneous impeachment would have had an impact on the result of the trial." State v. Lankford, 298 S.W.3d 176, 182-83 (Tenn. Crim. App. 2008). In cases where the defendant elected not to testify, the defendant is not required to make an offer of proof of what his testimony would be. State v. Galmore, 994 S.W.2d 120, 125 (Tenn. 1999). However, our supreme court has also recognized that, "[d]epending on the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." Id.

In this case the record does not contain the State's written notice of its intent to use the Defendant's prior convictions to impeach his testimony. However, the transcript indicates that the State filed a notice of impeachment, and the Defendant, in his brief, acknowledges that the State provided notice of its intent to impeach the Defendant with his prior convictions. The dates for all of the Defendant's prior convictions were within ten years of the instant trial. The trial court conducted a jury-out hearing and determined that the Defendant's prior convictions were not so similar to the charged offenses that their probative value on the issue of the Defendant's credibility was outweighed by the danger of unfair prejudice.

Upon review, we cannot conclude that the trial court abused its discretion. The Defendant was on trial for especially aggravated robbery and attempted second-degree murder. The State sought to impeach his testimony with his prior convictions for theft and felon in possession of a handgun. As noted above, theft convictions are highly probative of a defendant's credibility. See Baker, 956 S.W.2d at 15. Although we note that the elements of especially aggravated robbery include theft of property, the probative value of the Defendant's convictions for theft outweighed the danger of unfair prejudice. Further, the Defendant's prior conviction for felon in possession of a handgun is not

substantially similar to any of the charged offenses.  As such, the trial court did not abuse its discretion when it ruled that the Defendant's prior convictions could be used to impeach the Defendant's testimony.

Additionally, we note that the Defendant has not explained how he was prejudiced by the trial court's ruling.  It is clear from the record that the Defendant's theory of defense was to challenge the eyewitness identification.  He presented expert testimony to challenge the identifications made in this case and tested each identification on cross-examination.  Additionally, Detective Frias testified about the Defendant's statement to police, wherein the Defendant claimed that he ran to a friend's apartment as soon as the shooting started.  The Defendant has not articulated a theory of defense which required his testimony, and he has not made an offer of proof as to his proposed testimony.  See Galmore, 994 S.W.2d at 125; Taylor, 993 S.W.2d at 35.  As such, even if the trial court had abused its discretion in allowing the State to impeach the Defendant with his prior convictions, the Defendant has failed to prove that he was prejudiced by that ruling.  The Defendant is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE